IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:16-CR-5-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| ISMAEL AZUA-RINCONADA, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court to address the motions by Defendant Ismael Azua-Rinconada ("Defendant") to suppress all evidence seized on January 6, 2016 from Defendant's residence at 21 New Mexico Drive, Red Springs, North Carolina ("the residence"), including the results of Defendant's fingerprint identification, all custodial statements made by Defendant, and any fruits thereof. Def.'s Mots. [DE-22, -23]. The Government filed a response in opposition to Defendant's motions [DE-28] and the undersigned held an evidentiary hearing on April 26, 2016, to further develop the record. Hr'g Tr. [DE-33]. After the hearing, the Government filed a supplemental response in opposition. [DE-34]. Accordingly, this matter is ripe for review. For the reasons stated below, the undersigned recommends that Defendant's motions to suppress be denied.

## I. PROCEDURAL BACKGROUND

On January 8, 2016, a criminal complaint was filed against Defendant, charging that he was an alien present in the United States after having previously been denied admission, excluded, deported, and removed from the United States without obtaining permission to reapply for admission in violation of 8 U.S.C. § 1326(a). Compl. [DE-1]. On February 2, 2016, a Grand Jury sitting in the Eastern District of North Carolina indicted Defendant for the same offense. [DE-17]. At the suppression hearing, Defendant testified and presented the testimony of one witness: Ama Rylin

Ama Anba Powell ("Ms. Powell"), Defendant's fiancé, who was present at the residence on January 6, 2016 and gave permission for officers to enter the home.

The Government presented the testimony of two witnesses: (1) Special Agent Bryan Moultis ("Agent Moultis") of the Department of Homeland Security Immigration and Customs Enforcement ("ICE") and Homeland Security Investigations ("HSI"), who interviewed and fingerprinted Defendant at his residence on January 6, 2016; and (2) Corporal José Hernandez ("Corporal Hernandez") of the Hoke County Sheriff's Office Gang Unit who assisted Agent Moultis on January 6, 2016 by providing some translation services from English to Spanish. Corporal Hernandez was also wearing a body camera that recorded the encounter, and that footage was submitted on a USB drive as Gov't Ex. 5.[1] The Government submitted four (4) other exhibits: a photocopy of a consent to search form in Spanish signed by Defendant's brother-in-law Oscar Hernandez Heso ("Mr. Heso") (Gov't Ex. 1); a photocopy of a field interview questionnaire ("the questionnaire") completed by Defendant (Gov't Ex. 2); and photocopies of warrants for removal/deportation of Defendant dated June 17, 2011 (Gov't Ex. 3) and August 19, 2011 (Gov't Ex. 4). All exhibits were admitted without objection.

## II. STATEMENT OF THE FACTS

The following factual summary is taken from the testimony of the witnesses who testified at the suppression hearing and the body camera footage from Gov't Exs. 5-1 and 5-2 and establishes a timeline of the events that occurred on January 6, 2016.

On the morning of January 6, 2016, Agent Moultis, Corporal Hernandez, and four other

---

[1] The footage is saved in two files within a folder entitled "Ismael.video" on the USB drive submitted as Gov't Ex. 5. The first portion of the encounter is titled "Video1.MOV" and will be referred to as Gov't Ex. 5-1, and the second portion is titled "Video.MOV" and will be referred to as Gov't Ex. 5-2.

2

officers arrived at the trailer park where Defendant's residence was located. Hr'g Tr. [DE-33] at 30, 45-46; Gov't Ex. 5-1 at 00:00. Agent Moultis testified that the neighborhood was a "hot spot" for firearms and narcotics and he had previously encountered aliens who were not legally present in the United States while working there. Hr'g Tr. [DE-33] at 8. The officers planned to conduct a firearm and narcotics-related "knock and talk" at Defendant's residence. *Id.* at 8, 32. Six months earlier, an informant identified Defendant's residence as a marijuana distribution point and said it was associated with a neighboring trailer occupied by an individual who was suspected of smuggling marijuana from the border. *Id.* at 31-32.

At approximately 9:30 a.m., Agent Moultis and Corporal Hernandez approached the front door of Defendant's residence. Gov't Ex. 5-1 at 00:00. Agent Moultis was wearing a shirt that read "Police" across the chest, his law enforcement badge was visible around his neck, and he had a holstered firearm on his hip. *Id.* Corporal Hernandez knocked lightly on the door a few times and said "open the door" in Spanish. Hr'g Tr. [DE-33] at 8, 74-75; Gov't Ex. 5-1 at 00:00–01:30. Still speaking at a normal volume, he kept knocking lightly and said "Publisher's Clearinghouse." Gov't Ex. 5-1 at 01:31. The officers heard hushed voices and footsteps from inside, and Corporal Hernandez began knocking more forcefully and said "open the door or we are going to knock it down" in Spanish. Hr'g Tr. [DE-33] at 8, 74-75; Gov't Ex. 5-1 at 02:21–02:23. Corporal Hernandez continued to knock on the door, and said something in Spanish beginning with "policia." Gov't Ex. 5-1 at 02:34. Ms. Powell and Defendant later testified that they were asleep when the knocking began, but they heard Corporal Hernandez's statement about knocking down the door. Hr'g Tr. [DE-33] at 91-92, 119-20. On cross-examination, Defendant testified that he was able to see the officers through his bedroom window and identified them as law enforcement. *Id.* at 130. After identifying the officers, Defendant sent Ms. Powell to answer the door, even though she was pregnant, because

3

he was afraid of the officers due to his immigration status. *Id.* He stated that he was not afraid for Ms. Powell's physical safety at that time. *Id.* at 130-31.

Approximately two minutes and forty seconds after the officers arrived at the residence, Ms. Powell answered the door. Gov't Ex. 5-1 at 02:40. Corporal Hernandez asked Ms. Powell if she was home alone, and she responded that she was and asked if the officers were looking for someone. Hr'g Tr. [DE-33] at 10; Gov't Ex. 5-1 at 02:40–02:47. Agent Moultis said that he had heard other people inside and asked if the officers could come in and talk with her because it was cold outside. Hr'g Tr. [DE-33] at 10; Gov't Ex. 5-1 at 02:47–03:00. Without delay, Ms. Powell said "okay, you can come in," opened the door wider, repeated the phrase, and gestured to the living room behind her. Hr'g Tr. [DE-33] at 110; Gov't Ex. 5-1 at 03:00–03:05. Agent Moultis, Corporal Hernandez, and another officer entered the residence. Hr'g Tr. [DE-33] 10-11. However, Agent Moultis testified that based on the friendly nature of the encounter, the officers did not feel the need to do a safety sweep inside the residence. *Id.* Agent Moultis again asked Ms. Powell if anyone else was in the home and she admitted that Defendant and Mr. Heso were also in the home. *Id.* at 10; Gov't Ex. 5-1 at 3:13–03:32. The officers asked for everyone to gather in the living room (which was connected to an open kitchen) so they could all talk at once. Hr'g Tr. [DE-33] at 11; Gov't Ex. 5-1 at 03:44–03:48. Since everyone spoke English, Corporal Hernandez provided limited translation services. Hr'g Tr. [DE-33] at 10.

While Mr. Heso and Ms. Powell were sitting on the living room couch, Agent Moultis explained that the officers were checking on "hot spots" and had received information that "illegal people" lived in the residence. Gov't Ex. 5-1 at 04:37–04:46. Agent Moultis said that the officers were not concerned about that, but were focused on any guns that might be in the house because they had received tips about guns being in the residence as well. *Id.* at 04:46–04:52. Defendant emerged

4

from his bedroom and sat next to Ms. Powell on the couch. *Id.* at 05:01–05:06. The officers did not direct Defendant to take a seat or to sit in a particular place. *Id.* Agent Moultis said to Defendant "where are you from man, you don't look like you're from around here" and Defendant responded "yeah, I'm from around here" and "I've been here basically all my life." *Id.* at 05:15–05:25. After having a short conversation about crime in the neighborhood, Agent Moultis asked if there were any drugs or guns in the residence and asked for permission to search the home. *Id.* at 06:30–06:34. Mr. Heso stated that he rented the home and admitted to having guns in the house, and the officers then gave him a consent to search form written in Spanish. Hr'g Tr. [DE-33] at 12-13; Gov't Ex. 5-1 at 06:34–7:20. While Mr. Heso reviewed the consent to search form, Agent Moultis asked Defendant and Ms. Powell where they were originally from. Gov't Ex. 5-1 at 08:40. Defendant responded that he was from Mexico and Ms. Powell stated that she was from North Carolina. *Id.* at 08:40-08:47. Mr. Heso then signed the consent to search form. Hr'g Tr. [DE-33] at 13; Gov't Ex. 1. Agent Moultis asked whether there were any drugs in the residence, and Defendant responded in the negative. Gov't Ex. 5-1 at 11:29–11:44.

Officers brought a canine unit into the residence to assist with the search and secured the firearms that were located in Mr. Heso's bedroom. Hr'g Tr. [DE-33] at 13-15. No drugs were found during the search. *Id.* at 14-15. Agent Moultis asked for and received identification from everyone in the house, including from Defendant, and a third officer determined the relationships of the two families living in the residence while interviewing Mr. Heso about the firearms. Gov't Ex. 5-1 at 13:17, 25:41–26:03. Mr. Heso was married to Defendant's sister, who was at work, and their two children were at school. Hr'g Tr. [DE-33] at 90-91; Gov't Ex. 5-1 at 26:04–26:22. Defendant and Ms. Powell were engaged and expecting a baby, but they referred to each other as husband and wife. Hr'g Tr. [DE-33] at 89-90, 119.

5

Before speaking with Mr. Heso about the firearms, Agent Moultis instructed Defendant to fill out an immigration field questionnaire. Gov't Ex. 1 at 14:37–15:22. Agent Moultis used phrases such as "I want you to start filling this part out" and "why don't you go ahead and do that." *Id.* at 14:53–14:54, 15:21–15:22. Defendant took the form from Agent Moultis and began answering the questions. *Id.* at 15:22–15:23. On cross-examination, Agent Moultis stated that he instructed Defendant to fill out the questionnaire, but his mannerisms and demeanor turned the instruction into a question, based on the casual nature of the encounter and his tone of voice. Hr'g Tr. [DE-33] at 38-39. Agent Moultis stated that the questionnaire helps him establish whether someone is an alien. *Id.* at 18. Defendant completed the questionnaire and testified that he felt like he did have a choice as to whether to complete it or not. *Id.* at 124; Gov't Ex. 2. Defendant also testified that he was afraid while he was completing the questionnaire, because it asked questions related to immigration. Hr'g Tr. [DE-33] at 124. Defendant was also afraid for his pregnant fiancé and admitted that he did not answer the questions truthfully. *Id.* at 124-25. Agent Moultis testified that Defendant's answer to questions 9 through 12 on the questionnaire aroused his suspicions, in addition to question five, where Defendant stated that he was a Mexican citizen. *Id.* at 65-71. In answering questions 9 through 12, Defendant stated that he last entered the United States in 1999 in Texas by walking, and when asked if he had a visa and what type, Defendant responded "N/A." Gov't Ex. 2.

Agent Moultis verbally reviewed Defendant's answers to the questionnaire. Gov't Ex. 5-1 at 27:57–30:01. Agent Moultis asked about Defendant's tattoos and Defendant explained their meaning, denied any gang involvement, and pulled up his shirt to show Agent Moultis his tattoos on either side of his torso. Gov't Ex. 5-2 at 00:44–01:40. Agent Moultis told Defendant and Ms. Powell that they had a problem because he had talked to people who claimed to have purchased marijuana from Defendant's residence and the trailer next door, and the canine had been very interested in one

6

of the closets during the search. *Id.* at 01:47–02:13. Agent Moultis asked Ms. Powell if she and Defendant had started the process for Defendant to become a citizen and she responded that they had not yet but they wanted to. *Id.* at 02:14–02:25. Agent Moultis told Defendant and Ms. Powell they needed to help him out, because he could be a "roadblock" for that citizenship process if they were not honest with him. *Id.* at 02:26–02:41. Agent Moultis said that according to the questionnaire, Defendant was an illegal alien. *Id.* at 02:45–02:52. Agent Moultis asked whether Defendant had been arrested before, and Defendant responded that he had been arrested in Cumberland County. *Id.* at 02:54–03:00; Hr'g Tr. [DE-33] at 20.

Agent Moultis asked Defendant questions about Defendant's previous arrests and Defendant admitted that he had been arrested for speeding and a second time for driving a vehicle he had not known was stolen. Gov't Ex. 5-2 at 03:00–04:52. Defendant seemed uncertain about whether he had been convicted of a felony, as he stated that he took care of the charge of driving a stolen vehicle by hiring a lawyer. *Id.* Agent Moultis then asked Defendant whether he had been encountered by immigration officers in the jail, and Defendant responded in the negative. *Id.* at 05:12–05:23. Agent Moultis then asked whether Defendant had been deported and it is unclear whether Defendant said yes or no, but stated that he "didn't think it would count like that." *Id.* at 05:24–05:34. At the hearing, Agent Moultis testified that the jails in nearby counties run an arrestee's name and date of birth with immigration by doing a fingerprint check. Hr'g Tr. [DE-33] at 20-21. On cross-examination, Agent Moultis stated that he believed that there would be a record of Defendant having such an encounter with ICE based on Defendant's previous felony arrest in Cumberland County, which he knew to have run such checks in the past as it was a former member of the 287(g) program and the Criminal Alien Program and had a relationship with ICE and HSI. *Id.* at 54-55. Thus, according to Agent Moultis, Defendant's statements about not having encountered immigration

7

officials in jail after his felony arrest in Cumberland County were inconsistent with Agent Moultis' experience with that county's relationship with immigration officials. *Id.*

Agent Moultis decided to run Defendant's fingerprints based on Defendant's inconsistent answers on the questionnaire—using a fingerprint machine outside in his police car, he would be able to pull up any immigration records for Defendant (his "alien file"). Hr'g Tr. [DE-33] at 23, 26. After learning from Corporal Hernandez that the internet connection inside the trailer was slow and Corporal Hernandez had not been able to fully pull up Defendant's criminal records, Agent Moultis told Defendant "here's what I want to do . . . here, why don't you come with me, grab some shoes real quick, we're going to go to my car real quick, we're not going to go anywhere, we're just going to—need to grab some fingerprints, okay?" Gov't Ex. 5-2 at 06:25–06:33. Corporal Hernandez and Agent Moultis told Defendant to put on warmer clothing because it was cold outside. *Id.* at 06:33–06:36. Defendant did not give a verbal reply, but he stood up and walked into his bedroom alone, then returned to the living room dressed in warmer clothing. *Id.* at 07:42. Defendant followed Agent Moultis out of the residence, and was not escorted or restrained in any way. *Id.* at 07:42–07:38. At the hearing, Defendant testified that had he felt like he had a choice as to whether or not to go outside, but thought that if he refused, the officers would have said he was resisting. Hr'g Tr. [DE-33] at 126.

Agent Moultis testified that his police vehicle was parked off the road at the end of the driveway. *Id.* at 24. Agent Moultis was already in the back seat of the vehicle with his laptop pulled up by the time Defendant got to the car, and Defendant sat in front of Agent Moultis and was not restrained. *Id.* Agent Moultis again asked Defendant if he had been deported, and Defendant responded that he had not been. *Id.* at 127. Once Agent Moultis ran Defendant's fingerprints, he was able to pull up Defendant's alien file, which contained two warrants for deportation. *Id.* at 26; Gov't

8

Ex. 3 (warrant for deportation dated June 17, 2011); Gov't Ex. 4 (warrant for deportation dated August 19, 2011). Defendant was then handcuffed and taken inside the residence to say goodbye to Ms. Powell. Hr'g Tr. [DE-33] at 127.

## III. DISCUSSION

Defendant has moved to suppress all custodial statements made on January 6, 2016 and all items seized from his residence on that date, including identification documents and the results of his fingerprint identification. Def.'s Mots. [DE-22, -23]. Defendant asserts that suppression is required by the Fourth, Fifth, and Fourteenth Amendments to the Constitution, *Miranda v. Arizona*, 384 U.S. 436 (1966), and *United States v. Oscar-Torres*, 507 F.3d 224 (4th Cir. 2007). *Id.* Specifically, Defendant argues that the warrantless search of his residence was conducted without valid consent to enter or probable cause, and even assuming consent to enter was given, Defendant was unconstitutionally detained without being *Mirandized* at the time he answered officers' questions and complied with officers' demands to provide identification documents and fingerprint identification. *Id.*; Hr'g Tr. [DE-33] at 148-49. In response, the Government argues that Ms. Powell voluntarily consented to officers entering the residence, Defendant was never in custody, and Defendant's statements, fingerprints, and identification documents were voluntarily provided. Gov't Resp. [DE-28]. In the alternative, the Government argues that even assuming Defendant was in custody, the officers had authority pursuant to immigration law to question Defendant and obtain his fingerprints in order to determine his immigration status. *Id.*

### A. Consent to Enter

Defendant argues that the officers did not have voluntary consent to enter his residence because Ms. Powell opened the door in response to Corporal Hernandez's statement threatening to knock down the door, which by implication threatened physical violence for the occupants'

9

noncompliance. Hr'g Tr. [DE-33] at 147-48. In response, the Government argues that Ms. Powell gave voluntary consent for the officers to enter the residence. Gov't Resp. [DE-28] at 7-8. The parties agree that aside from the voluntariness dispute, Ms. Powell had authority to allow the officers to enter because she was an adult and one of Defendant's roommates at the residence. *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares . . . authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.") (citations omitted); *United States v. Shrader*, 675 F.3d 300, 306 (4th Cir. 2012) (citations omitted); Hr'g Tr. [DE-33] at 147-48.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Accordingly, "[w]arrantless entries into a residence are presumptively unreasonable." *United States v. Cephas*, 254 F.3d 488, 494 (4th Cir. 2001) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). Even so, "[a] voluntary response to an officer's knock at the front door of a dwelling does not generally implicate the Fourth Amendment, and thus an officer generally does not need probable cause or reasonable suspicion to justify knocking on the door and then making verbal inquiry." *Id.* at 493. Beyond this initial encounter, however, an entry into a residence or a search without a warrant issued upon a showing of probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). Valid consent is one such exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citations omitted); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001) (citation omitted). In order to be valid, consent must be knowing and voluntary, and the determination of whether consent was

10

voluntary is based on the totality of the circumstances. *United States v. Buckner*, 473 F.3d 551, 554-55 (4th Cir. 2007) (citations omitted); *United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001) (citations omitted). The Government has the burden of establishing valid consent to search, which it must show by a preponderance of the evidence. *Buckner*, 473 F.3d at 554 (citation omitted).

> Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. Written consent supports a finding that the consent was voluntary. Consent given while in custody may still be voluntary.

*Boone*, 245 F.3d at 361-62 (internal citations omitted). However, the burden of proving voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that consent was involuntary where police officers falsely represented to a homeowner that they had a search warrant for the home and then asked for consent to search) (footnote omitted); *see also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all."). Further, "[c]onsent may be inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) (citations omitted).

Voluntary consent cannot be "coerced by threats or force, or granted only in submission to a claim of lawful authority[.]" *Schneckloth*, 412 U.S. at 233 (citations omitted); *see Gregg v. Ham*, 678 F.3d 333, 337, 342 (4th Cir. 2012) (holding consent was involuntary where a physically disabled woman was alone in her bed at 7:30 a.m. when a bail bondsman, armed with a shotgun, along with a deputy and two other bondsmen, violently shook the door and warned plaintiff that she "had to let them come in or he was going to come in" and plaintiff did not know that an officer was present

11

before opening the door); *United States v. Elie*, 111 F.3d 1135, 1145-46 (4th Cir. 1997) (holding consent was voluntary even though at least six officers were present when the defendant granted consent to search and noting that the absence of *Miranda* warnings is another factor to be considered in assessing voluntariness and "neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself.") (internal quotation marks, alterations, and citations omitted), *abrogated in part on other grounds by Dickerson v. United States*, 530 U.S. 428 (2000); *United States v. Alvarez-Herrera*, No. 5:13-CR-61-FL, 2013 WL 6531175, at *23 (E.D.N.C. Dec. 12, 2013) (unpublished) (holding consent was voluntary where the defendant was asked for and gave consent in his native language in the presence of only two officers, the officers made no false or misleading statements suggesting that the defendant could not refuse consent, and the defendant had been cooperative in complying with the officer's requests throughout the encounter); *United States v. Hernandez Sanchez*, No. 5:11-CR-65-FL, 2011 WL 3420605, at *9 (E.D.N.C. July 8, 2011) (unpublished) (holding consent was voluntary where "there [were] no known characteristics of the defendant, such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary" where Defendant had a high school education, owned a business, and could converse intelligently with the officers, and officers did not use threatening language or raised voices, even though the defendant "was subject to a pat-down search, there were up to seven officers present[,] the encounter took more than a few minutes and . . . officers had blocked in [the defendant's] vehicle with at least three of their own vehicles."), *adopted by* 2011 WL 3420598 (E.D.N.C. Aug. 4, 2011).

Having considered the relevant factors and the totality of the circumstances, Ms. Powell gave voluntary and knowing consent for officers to enter the residence even if she heard Corporal Hernandez's comment about breaking down the door. As in *Hernandez Sanchez*, "there are no

12

known characteristics of the [individual], such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary." 2011 WL 3420605, at *9. For example, Ms. Powell testified that she was born in North Carolina and had lived there her entire life, she was 20 years old, had completed high school and a two-year degree, and was enrolled in a nursing program. Hr'g Tr. [DE-33] at 89. Although six officers were on site and some had sidearms visible, only Agent Moultis and Corporal Hernandez ascended the front steps to knock on the door and neither officer drew his weapon. *See Elie*, 111 F.3d at 1145 (holding that the defendant's consent was voluntary although six officers were present, and the arresting officer had previously drawn his sidearm and handcuffed defendant). Ms. Powell spoke English, and Corporal Hernandez did not need to translate. *See Alvarez-Herrera*, 2013 WL 6531175, at *23 (holding consent was voluntary where the defendant was asked for and gave consent in his native language in the presence of only two officers). Further, Ms. Powell was home with her fiancé and his brother-in-law, and the encounter took place at 9:30 a.m. when it was light outside. Additionally, right before Ms. Powell opened the door, Corporal Hernandez said something beginning with "policia."

To be sure, there are some factors here that would support a finding that Ms. Powell did not give voluntary and knowing consent. For example, Ms. Powell and Defendant both testified that they heard Corporal Hernandez say "open the door or we are going to knock it down." Agent Moultis testified that the officers heard hushed voices and footsteps inside the home while they were standing outside the door, suggesting the construction of the trailer allowed sound to travel through the walls to some degree. Indeed, Corporal Hernandez testified to speaking louder after his initial knock to ensure those inside could hear him. Also, Agent Moultis and Corporal Hernandez did not explicitly tell Ms. Powell she could refuse to let them enter the residence. *See Boone*, 245 F.3d at 361-62 (noting that whether the consenting party was informed of the right to refuse a relevant factor, but

13

not a determinative one). However, unlike the disabled defendant in *Gregg*, who was home alone when officers pounded on her door and demanded to enter or they would force their way inside, Ms. Powell had an opportunity to confer with Defendant, who testified that he had identified Agent Moultis as law enforcement before instructing Ms. Powell to answer the door. *See* 678 F.3d at 337, 342 (holding consent to enter was involuntary where the plaintiff could see a bail bondsman pointing a shotgun at her door before she answered but did not see the sheriff's deputy who was also at her door). Defendant testified that he saw Agent Moultis and Corporal Hernandez through the window but no other officers, suggesting the other officers remained away from the residence and did not surround the house.

Further, once Ms. Powell opened the door, the conversation was not hostile or accusatory. *See Elie*, 111 F.3d at 1145 (noting that a conversational tone between officers and the subject of the search is a relevant factor that supports consent being given voluntarily). Agent Moultis and Corporal Hernandez did not use threatening or coercive statements and did not use their authority to command to come inside, rather, they asked permission to enter and speak with Ms. Powell as it was cold outside. *Cf. Bumper*, 391 U.S. at 546-47, 550 (holding that consent was not knowing and voluntary when officers were let into a home after one of them falsely claimed to have a search warrant). Ms. Powell did not hesitate in granting consent for the officers to enter once they asked, she responded that they could come inside, opened the door wider, and gestured to the living room behind her. *See Hylton*, 349 F.3d at 786-87 ("Consent may be inferred from actions as well as words."). Therefore, the totality of the circumstances demonstrates that Ms. Powell verbally and physically communicated voluntary consent for the officers to enter the residence.

## B. Defendant's Statements, Fingerprints, and Identification Documents

Defendant argues that he was in custody when he spoke with officers, provided identification

14

documents, completed an immigration questionnaire, and provided his fingerprints. Def.'s Mots. [DE-22, -23]. Additionally, Defendant contends that his statements were involuntary as they were induced by the officers' threats, promises, and actions. Def.'s Mot. [DE-22] at 3. Accordingly, Defendant asserts that the statements and documents obtained, the results of the electronic fingerprint identification, and any fruit thereof must be suppressed. Def's Mots. [DE-22, -23].

The parties do not dispute that Defendant was never read his *Miranda* rights on January 6, 2016. In the initial response to Defendant's motions, the Government asserted that Agent Moultis informed Defendant that he was not under arrest and was free to leave. Gov't Resp. [DE-28]. However, after the hearing, the Government filed a supplemental response indicating that this statement does not appear on the video recording of the encounter. Gov't Suppl. Resp. [DE-34]. Even so, the Government argues that Defendant was never in custody because the officers did not perform a security sweep, Defendant was never restrained and his movements were not restricted, the officers encouraged Defendant to put on warmer clothes before going outside, and Defendant voluntarily followed Agent Moultis outside and provided his fingerprints. Gov't Resp. [DE-28] at 8-9.

### i.    Custody

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this right, the Supreme Court adopted in *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), several procedural rules governing custodial interrogations, that is, interrogations conducted after a suspect has been formally arrested or "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Prior to any questioning, an individual in custody must be warned "that he has the right to remain silent, that anything he says

15

can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him . . . ." *Miranda*, 384 U.S. at 478-79. Any statement elicited in violation of these procedural rules is inadmissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (citing *Harris v. New York*, 401 U.S. 222 (1971)). The question for resolution here is whether Defendant was in custody at any point on January 6, 2016, as it is clear that he was subject to interrogation and was not read his *Miranda* rights. If Defendant was not in custody, then no *Miranda* warnings were required. *See United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (holding statements were admissible despite absence of *Miranda* warnings where defendant was not in custody during questioning).

An individual is in custody for *Miranda* purposes when he is formally arrested or his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted). The custody inquiry is objective: the question is not whether the suspect or the interrogating officer believes that the suspect was in custody, but whether a reasonable person in the suspect's position would have understood that he or she was in custody. *Id.* at 442; *accord United States v. Hargrove*, 625 F.3d 170, 181-82 (4th Cir. 2010) (giving limited consideration to the defendant's testimony about his subjective feelings in considering whether he was in custody) (citing *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) ("Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by his self-interest.") (internal quotation marks, citations, and alterations omitted)). Since the determination of whether an individual is in custody is a fact-intensive inquiry, this determination must be made on a case-by-case basis based on the "totality of the circumstances." *United States v. Jones*, 818 F.2d 1119, 1123-24 (4th Cir. 1987) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). A court must first

16

examine all of the circumstances surrounding the interrogation and then determine, under those circumstances, whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d). There are numerous factors to be considered in making a custody determination, including, but not limited to:

(1) Whether defendant was informed that he was not under arrest and that he was free to terminate the questioning;

(2) Whether defendant possessed unrestrained freedom of movement during questioning;

(3) Whether defendant voluntarily submitted to questioning;

(4) Whether the agents employed strong arm tactics or deceptive stratagems during questioning;

(5) Whether the atmosphere of the questioning was police-dominated; and

(6) Whether defendant was placed under arrest at the termination of the questioning.

*United States v. Jefferson*, 562 F. Supp. 2d 707, 713-14 (E.D. Va. 2008) (internal footnotes and citations omitted); *see also United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) ("Among the facts to be considered are 'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'") (quoting *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002)).

It is important to note that the environment does not have to be entirely free of coercion in order to be non-custodial—indeed, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. However, in cases where the Fourth Circuit has determined that an individual was

17

subject to custodial interrogation, something more has been present beyond the naturally-occurring coercive aspects of being questioned by a police officer. *See United States v. Hashime*, 734 F.3d 278, 282-86 (4th Cir. 2013) (holding that the defendant was subjected to custodial interrogation where he was awoken naked, at gunpoint, after 15-30 officers swarmed his family's home armed with a battering ram in the early morning hours, ordered everyone outside in the cold even though some people were in pajamas, and defendant was questioned in a basement storage room for three hours by two agents); *United States v. Colonna*, 511 F.3d 431, 434-36 (4th Cir. 2007) (holding that an interrogation was custodial and "occurred in a police dominated environment where the agents did everything to make . . . any reasonable man believe that he was not free to leave," where 24 officers swarmed Colonna's home in the early morning hours, awoke him at gunpoint after kicking his bedroom door open, restricted his family's access to their home, kept Colonna under constant guard, and two armed officers interrogated him for three hours in a police vehicle even though he was told he was not under arrest). Further, in *Hashime*, the officers told the defendant that he had to remain under guard and despite telling him that he did not have to answer their questions, was not under arrest, and he could leave, also told the defendant that they needed to know the truth and he needed to be completely honest even if he was afraid or did not want to answer the questions. 734 F.3d at 282-86.

The location of the questioning is also an important consideration in the totality the circumstances analysis: "an interview at the suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over . . . the defendant, and thus suggests a setting that is not of the degree typically associated with a formal arrest." *Hargrove*, 625 F.3d at 177-82 (collecting cases) (holding a two-hour interview was non-custodial where 10-15 officers arrived in the early morning hours to execute

18

a search warrant, officers had weapons drawn during an initial security sweep, the defendant was subject to a pat-down search, officers told him he was free to leave, the defendant was interviewed by two officers in his kitchen and never asked for the questioning to stop or refused to answer, the defendant was not handcuffed, no weapons were drawn during the interview, and the defendant was permitted to move around his house if it did not interfere with the search); *see also Parker*, 262 F.3d at 417-19 (holding that a 30-minute interview with two agents in a bedroom with the door closed was not custodial where six or seven agents arrived at the defendant's home in the early morning hours, the defendant was neither handcuffed nor restrained, no weapons were drawn in her presence, one of her relatives requested to enter the bedroom during the question and was allowed to do so twice, and the defendant was not forced to go into the room with the officers and was never told that she was not free to leave).

Here, considering the relevant factors and the totality of the circumstances, Defendant was not in custody on January 6, 2016. Agent Moultis interviewed Defendant in his living room around 10:00 a.m., when it was light outside, Agent Moultis and Corporal Hernandez introduced themselves, explained their purpose, and asked for everyone in the trailer to come to the living room without conducting a security check, the officers did not raise their voices, brandish their weapons, touch anyone in the house, or direct Defendant where to sit, and they asked permission for additional officers to enter the residence. *See Day*, 591 F.3d at 696 (listing factors for the court to consider when completing a totality of the circumstances custody analysis); *Hashime*, 734 F.3d at 284 (noting that a family's loss of control over their home—such as being forced to stand outside—is suggestive of a custodial situation). Throughout the encounter, Agent Moultis and Corporal Hernandez used instructive phrases and requests, instead of commands, such as "would you mind if we search?" "good to go?" "I want you to start filling this part out, ok?" and at no point during Agent Moultis'

19

questions did Defendant protest or refuse to comply.

Some factors would support a finding of custody here, for example, that Defendant was never advised that he was not under arrest or was free to leave, three officers entered the residence with visible weapons, and Agent Moultis implied Defendant was a suspect by saying he had received a tip that the "illegal people" living at the New Mexico Drive residence were distributing marijuana, asking to search the residence for illegal drugs and firearms, and asking Defendant to fill out a questionnaire. *See Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985) (noting that a suspect being advised that he is not under arrest is a relevant but not determinative factor in a custody analysis); *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997) (noting that an officer telling the individual being questioned that he is a suspect is a relevant but not a determinative factor in a custody analysis).

Even so, it is also important to note that Agent Moultis did not isolate Defendant from Ms. Powell or Mr. Heso before questioning him and only fingerprinted him in the car because the necessary equipment was located there. *See Hashime*, 734 F.3d at 283 (noting the isolation of a suspect from family members is suggestive of a custodial situation). Defendant went to his room alone to put on warmer clothes before he followed Agent Moultis outside, and he was not he was not coerced or restrained. Defendant was very cooperative and polite during the encounter with Agent Moultis, and even pulled up his shirt to show Agent Moultis his tattoos. Per *Hargrove*, 625 F.3d at 181-82, the undersigned gives limited consideration to Defendant's testimony that he felt compelled to cooperate by filling out the questionnaire and providing his fingerprints because he wanted to protect his fiancé and thought that if he refused, Agent Moultis and Corporal Hernandez would say he had been uncooperative, as the standard is an objective one. *See also Berkemer*, 468 U.S. at 442 ("[T]he only relevant inquiry" as to whether an individual is in custody "is how a reasonable man in

20

the suspect's position would have understood his situation."). Moreover, even crediting that statement, Defendant testified that he was afraid because the questionnaire dealt with his immigration status and the possible effects on his family, not because of how the officers were treating him. Accordingly, under the totality of the circumstances, Defendant's freedom of action was not "curtailed to a degree associated with formal arrest[,]" and he was not in custody on January 6, 2016. *Berkemer*, 468 U.S. at 440.

### ii. Voluntariness

Involuntary statements are inadmissable under the Fifth Amendment. *See Braxton*, 112 F.3d at 780 (citations omitted). "A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *Id.* (citing *Elstad*, 470 U.S. at 304 (further citations omitted)). To determine whether a statement is voluntary, the court considers whether it was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (internal quotation marks and citations omitted). Voluntariness is determined from the "'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980)). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780. The critical inquiry is "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Pelton*, 835 F.2d at 1071-72 (quoting *Schneckloth*, 412 U.S. at 225); *see also Braxton*, 112 F.3d at 783 ("The proper inquiry is whether the confession was 'extracted' *by* the threats or implied promises, 'however slight.'") (quoting *Hutto*, 429 U.S. at 30);

21

*accord United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012) (holding that a suspect's statement to an officer was voluntary when the suspect did not "ask for the interview to end or indicate that he . . . desired a break, or otherwise was unwilling to proceed."). In discussing coercive conduct that rendered statements involuntary, the Fourth Circuit has noted the following examples: (1) physically harming or threatening to harm the defendant if he or she refused to answer questions; (2) depriving the defendant of clothes, food, sleep, or contact with others; (3) lengthy periods of questioning or isolation; and (4) deceptive conduct. *See Braxton*, 112 F.3d at 784-85 (collecting cases).

"Truthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." *Pelton*, 835 F.2d at 1073 (holding that the defendant's statements were voluntary where FBI officers stated they would conduct a full scale investigation if he did not cooperate where that was a course that the investigation could legally and properly take); *accord United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005) (holding that statements were voluntary where "the agents simply informed [the defendant] of the gravity of his suspected offenses and the benefits of cooperation under the federal system."); *United States v. Mikerin*, No. TDC-14-0529, 2015 WL 2227698, at *9 (D. Md. May 7, 2015) (unpublished) (holding the agents' statements that if the defendant cooperated, his family and Russian business associates would not find out about the investigation, but the investigation would be made public if he did not cooperate did not constitute threats or promises that would render the defendant's statements involuntary). Further, "[a]gents may properly initiate discussions on cooperation, and may indicate that they will make this cooperation known . . . . General encouragement to cooperate is far different from specific promises of leniency." *Pelton*, 835 F.2d at 1073 (citing *United States v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985)); *see also Braxton*, 112 F.3d at 781-82 (holding that the officers' statements that they needed to talk to the defendant, he could face up to five years in prison, and that they thought he was not

22

coming clean did not constitute coercive conduct).

Taking into account the relevant factors and the totality of the circumstances, Defendant made voluntary written and oral statements to officers on January 6, 2016, and voluntarily provided his fingerprints. Indeed, Defendant testified that he felt like he had a choice to fill out the questionnaire or not. And like the defendant in *Holmes*, Defendant never asked "for the interview to end or indicate that he . . . desired a break, or otherwise was unwilling to proceed." 670 F.3d at 592. Instead, Defendant took the form from Agent Moultis, filled it out, and answered Agent Moultis' questions politely and cooperatively without objection.

The only moment during the interaction on January 6, 2016 that could be understood as a threat or implied promise occurred when Agent Moultis asked Ms. Powell if she and Defendant had started the process for Defendant to become a citizen. When Ms. Powell replied that they had not but expressed their desire to start the process, Agent Moultis said that Defendant's answers to the questionnaire suggested he was an illegal alien and that the couple must be honest with him, or he could be a road block for the citizenship process. However, Agent Moultis' comment here is similar to the officer's comments in *Braxton*, where the interviewing officer repeatedly told the suspect he was "not coming clean" and "you can do five years because you're not coming clean." 112 F.3d at 781-82. The same distinction should be drawn here that the court drew in *Braxton*: Agent Moultis stressed that Defendant should be truthful if he spoke, but Agent Moultis did not insist that Defendant had a duty to speak. *See id.* (distinguishing an officer wrongfully telling a suspect that "he had a duty to speak" from the officer in question properly telling the suspect that "if he spoke he was required to do so truthfully[]"). Agent Moultis' statement does not resemble the methods that courts have found to have induced involuntary statements in other cases. *See id.* at 784-85 (listing methods such as deceptive conduct, physical violence, and deprivation of food and sleep).

23

Further, even if Agent Moultis' statement influenced Defendant to participate in the interview, it does not follow that Defendant's statement was involuntary. *See id.* at 783. Rather, the court must ask "whether the confession was 'extracted' *by* the threats or implied promises[.]" *Id.* In *Braxton*, the court held that the suspect's comments were made voluntarily during the interview because the officer's statements were not "sufficient to cause the [suspect's] will to be overborne and his capacity for self-determination to be critically impaired." *Id.* at 784-84. Similarly, the undersigned finds that under the totality of the circumstances Agent Moultis' single statement suggesting that it would be difficult for Defendant to pursue citizenship if he was untruthful with the officers did not "cause [Defendant's] will to be overborne and his capacity for self-determination to be critically impaired" so as to render his statements involuntary. *See id.* No other methods used by Agent Moultis or Corporal Hernandez during the interview with Defendant suggest that Defendant's statements could be considered involuntary under the Due Process Clause. Accordingly, Defendant voluntarily gave written and oral statements to officers and provided his fingerprints, and it is thus recommended that his motions to suppress be denied. While Defendant argues that *Oscar-Torres* controls here and requires that the results of his fingerprint identification and the information derived therefrom be suppressed, *Oscar-Torres* does not apply because the defendant there was subject to an illegal arrest at the time of the fingerprint identification and here, Defendant was not in custody and voluntarily gave statements and provided his fingerprints to the officers. 507 F.3d at 226-27.

## IV. CONCLUSION

For the reasons set forth above, the undersigned RECOMMENDS that Defendant's motions to suppress [DE-22, -23] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **Thursday, November 10,**

**2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

SUBMITTED, the _27_ day of October 2016.

Robert B. Jones, Jr.
United States Magistrate Judge

25